IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 4:01CR3125 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| | ) | |
| DAVID TABOR, | ) | |
| | ) | |
| Defendant. | ) | |

"The bottom line is that poor people are the ones
that use crack cocaine and mostly minorities."[1]

For more than a decade, I have been deeply troubled by, and have written critically about, the crack cocaine Guidelines. See, e.g., United States v. McMurray, 833 F. Supp. 1454 (D. Neb. 1993). For example, in McMurray, after examining the history of Congress' adoption of the crack cocaine penalty structure, I lamented, but imposed, the mandatory life sentence called for by application of the crack Guidelines on Stephanie Lomax, who is now known as Hamedah Ali Hasan.[2] I imposed that

---

[1]140 Cong. Rec. H2694 (daily ed. April 21, 1994) (statement of Rep. Hughes), *quoted in* Elizabeth Tison, Amending the Sentencing Guidelines for Cocaine Offenses: The 100-to-1 Ratio is Not as "Cracked" Up as Some Suggest, 27 S. Ill. U. L. J. 413, 419 n.41 (2003) (hereinafter, Tison, Amending the Sentencing Guidelines).

[2]Six years later, and pursuant to a retroactive Guideline amendment, I was able to reduce her prison sentence to 324 months, although I was partially reversed when I also departed downward to 144 months due to the defendant's extraordinary rehabilitation in prison. United States v. Hasan, 41 F. Supp. 2d 1004 (D. Neb. 1999), *aff'd,* United States v. Hasan, 205 F.3d 1072 (8th Cir. 2000), *reh'g en banc granted, opinion vacated,* United States v. Hasan, 213 F.3d 1049 (8th Cir.), *rev'd in part,* United States v. Hasan, 245 F.3d 682 (8th Cir.) (en banc), *cert. denied,* Hasan v. United States, 534 U.S. 905 (2001). On remand, I sentenced Ms. Hasan to 324 months. For what it is worth, I respectfully renew my plea that the President

sentence on Ms. Hasan, a young, black[3], poorly educated, single, pregnant mother of two with no criminal history, for her jury-proven substantial, but non-violent, involvement in a large crack cocaine conspiracy that operated between the West Coast and Omaha, Nebraska. Id. at 1457-59, 1472-73, 1485.

In this case, David Tabor (Tabor), a 40-year-old black man with no criminal history points, stands convicted after a jury found that he was involved in a medium-sized crack conspiracy that operated between Kansas City, Missouri, and Lincoln, Nebraska. The jury found that the conspiracy as it pertained to Tabor involved 50 grams or more of crack cocaine. The presentence report (PSR) found that Tabor was responsible for at least 500 grams but less than 1.5 kilograms of crack. (PSR ¶¶ 27, 35.)

Given my newly minted discretion under Booker[4], I advised the parties that I intended to decide what weight, if any, to give the crack cocaine Guidelines. I also advised the parties that if I decided not to give weight to those Guidelines, I would decide what other method should be used when imposing a crack cocaine sentence.

---

commute Ms. Hasan's sentence to 144 months or less.

[3]I mention race because the crack Guidelines tend to fall more heavily upon blacks than whites. See, e.g., McMurray, 833 F. Supp. at 1460-61 (reciting statistics). While I will discuss this problem later, it is my firm belief that the disparate impact of the crack Guidelines is not the result of any racial animus.

[4]United States v. Booker, 125 S. Ct. 738, 764 (2005) (declaring the mandatory nature of the Guidelines to be unconstitutional, but creating a remedy that "requires judges to take account of the Guidelines together with other sentencing goals").

I encouraged counsel and the Federal Public Defender[5] to give me their views before I made my decision. The parties have responded (filings 138 & 139), and their briefs are well-reasoned and helpful. The Defender has also faxed a brief to me which is equally thoughtful and well-written. I thank them all for their efforts.

After carefully considering all the submissions, I now decide that the crack Guidelines, like all other Guidelines, should be given heavy weight after Booker.[6] Finding no plainly superior reason to do otherwise, I will apply the crack Guidelines and impose a prison sentence within the otherwise applicable Guideline range. Although the Sentencing Commission and many judges (including me) disagree with Congress on this point, the crack cocaine Guidelines represent a reasoned and reasonable policy choice by Congress that should be given substantial deference. When that deference is properly recognized, the crack Guidelines should be implemented without judicial alteration. The reasons for this decision are set forth below.

## I.  Background

I first review the facts relevant to this defendant. After that, I review the history of the crack cocaine Guidelines.

---

[5]Because the defendant was not represented by the Federal Public Defender, and because I wanted the Defender's institutional expertise, I invited him to submit a brief as amicus curiae if he thought it appropriate to do so.

[6]I have previously expressed my views in a published opinion and in testimony before the United States Sentencing Commission that after Booker the Guidelines should normally be accorded heavy or substantial weight. See United States v. Wanning, 354 F. Supp. 2d 1056 (D. Neb. 2005); Prepared Testimony of Richard G. Kopf for the United States Sentencing Commission (February 11, 2005), *available at* www.ussc.gov/hearings/02_15_05/Kopf_testimony.pdf. I continue to adhere to those views.

## A.  *The Defendant and His Crime*

Taken from the presentence report (to which there are no pertinent objections), the evidence presented at trial, and the court files, the following facts are the most salient:

* *The Crime:*  Tabor was charged with a conspiracy to distribute and possess with intent to distribute 50 or more grams of crack cocaine.[7]  A jury found him guilty.  The jury also found that the conspiracy as it pertained to him involved 50 grams or more of crack.  The evidence against Tabor was strong to overwhelming. It essentially showed that Tabor (known as Big Country or Country) was a middle-man in Kansas City who helped supply dealers in Lincoln, Nebraska, with crack cocaine.

* *The Guidelines:*  Using very conservative estimates from the trial, the government believed that the defendant was responsible for between 500 grams and 1.5 kilograms of crack.  The government did not believe that any upward or downward role adjustment was warranted.   The probation officer conducted an independent investigation and found that the government's drug quantity estimate was correct, although the probation officer selected the high end of the base offense level.  (PSR ¶ 35.)[8] The officer also

---

[7]The defendant was therefore eligible under the statutes for a prison sentence of 10 years to life.  21 U.S.C. § 841(b)(1)(A).

[8]Although the defendant, through his counsel, has technically filed an objection to the probation officer's calculation that the correct drug quantity was at the upper end of base offense level 36, his counsel agreed that Tabor was responsible for somewhere between "500 grams to 1.5 kilos" and stated "I realize that the guidelines are still going to be level 36 either way."  (Filing 95 ¶ 1).  Defense counsel's concession makes a great deal of sense since the government's estimates were

agreed that Tabor warranted no role enhancement or reduction. (PSR ¶ 37.)  Since there were no other aggravating or mitigating factors, Tabor's total offense level was 36.  (PSR ¶ 42.)  Tabor falls into criminal history category I, although he has had a fair number of police contacts.  (PSR ¶¶ 47-55.)  These include an arrest for attempted murder and use of a deadly weapon to commit a felony, which was not prosecuted.  According to the presentence report, there is also an outstanding warrant for the defendant in Kansas City, Missouri, for failure to appear on a domestic violence charge.  (PSR ¶ 54.)  Under the Guidelines, Tabor's presumptive prison sentence ranges from 188 months to 235 months.  (PSR ¶ 73.)  Tabor's Guideline range for supervised release is 5 years.  (PSR ¶ 76.)

\*      *Related Defendants:*  Among other witnesses testifying against the defendant, four men in closely related cases cooperated with the government and testified against Tabor and another party. These men, LaSalle Prewit, Kennan Mallory, Miai Lewis, and Arrmon Daugherty, respectively received prison sentences of 210 months, 188 months, 210 months, and 235 months.  Prewitt awaits a Rule 35 sentence reduction.  Mallory's sentence was reduced to 36 months after a Rule 35 motion by the government was granted.  Lewis' sentence was reduced to 60 months pursuant to a Rule 35 motion filed by the government.  Likewise,

---

conservative and based upon testimony given under oath at trial.  The government would likely have convinced me that the quantity was greater than 1.5 kilograms had the base offense level been challenged by Tabor.  In any event, and giving the benefit of the doubt to the defendant, I independently find by the greater weight of the evidence presented a trial that Tabor is responsible for at least 1 kilo of crack cocaine. (PSR ¶¶ 7-26; Filing 140 (Government's Citations to Trial Transcript).)  That amounts to somewhere between 1000 and 4000 street-doses.

Daugherty's sentence was reduced to 66 months.  Eric Casillas, Tabor's codefendant, also cooperated with the government and testified against Tabor and another defendant in a related case. Casillas was originally sentenced to 87 months in prison, but, after two Rule 35 motions, his sentence was ultimately reduced to 27 months.

\*      *Personal Characteristics and Background:*  Tabor is 40 years old. (PSR at page 2.) He graduated high school and served honorably in the United States Army.  (PSR ¶¶ 66, 68.)  After his arrest, Tabor began to work as a scrap metal salesman for a pastor.  (PSR ¶ 67.)  Before that, he worked for himself as a dirt hauler, but terminated this work because of lack of work and because his truck broke down.  (Id.)  He provided no other work history.  He suffers no physical, mental, or emotional problems and he has not been treated for alcohol or substance abuse.  (PSR ¶¶ 63-65.) Tabor has never married, but he has two children by different women.  (PSR ¶¶ 61-62.)  The custody of these children is with their mothers.  (PSR ¶ 62.)

\*      *An Unusual Twist:*  Tabor filed a motion for new trial asserting that several of the cooperating witnesses perjured themselves when they testified against him at trial.  (Filing 89.)   An evidentiary hearing was scheduled and 1.5 days were allotted to resolve the question of whether Tabor was unjustly convicted by perjury.  (Filing 108.)  However, on the day of the evidentiary hearing, Tabor withdrew his motion for new trial.  (Filing 129.) In exchange, the government promised not to prosecute him or seek a sentencing enhancement based upon Tabor's assertions and conduct relating to the motion for new trial.  (Filing 129.)

## B.  A Short History of Crack Cocaine Penalties

The first Congressional response to crack cocaine, in which the harsh penalty structure we presently enforce came into being, was contained in the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986).  The legislative history of that Act, and the 100-to-1 ratio for crack cocaine, is fully and fairly developed and summarized by the Sentencing Commission in one of its reports.  See United States Sentencing Commission, Special Report to the Congress:  Cocaine and Federal Sentencing Policy (February 1995) (hereinafter "1995 Report"), *available at* http://www.ussc.gov/crack/exec.htm.

To get right to the point of this discussion, the Congressional response to crack cocaine was intentional (not accidental) and it was reasoned:

> The decision by Congress to differentiate crack cocaine from powder cocaine in the penalty structure was deliberate, not inadvertent.
>
> . . . .
>
> Congress's conclusions about the dangerousness of crack cocaine relative to powder cocaine flowed from specific assumptions.  First, crack cocaine was viewed as extraordinarily addictive.  This addictive nature was stressed not only in comparison to powder cocaine (*i.e.*, crack cocaine is "the more addictive . . . substance" [132 Cong. Rec. S8092 (June 6, 1986) (statement of Sen. D'Amato regarding S. 2580). *See also* 132 Cong. Rec. S14,293 (Sept. 30, 1986) (statement of Sen. Bumpers).] but also in absolute terms.  Second, the correlation between crack cocaine use and the commission of other serious crimes was considered greater than that with other drugs. Floor statements focused on psychopharmacologically driven, economically compulsive, as well as systemic crime (although members did not typically use these terms).  Third, the physiological effects of crack cocaine were considered especially perilous, leading to psychosis and death.  [132 Cong. Rec. 26,447 (Sept. 26, 1986) (statement of Sen. Chiles).]  Fourth, members of Congress felt that young people were particularly prone to using crack cocaine.  This was mentioned in debate as one of crack cocaine's

> most troubling features.  Finally, there was a great concern that crack's "purity and potency," the cost per dose, the ease with which it is manufactured, transported, disposed of, and administered, were all leading to widespread use of crack.

1995 Report at 117-18.

Consequently, Congress established what has become known as the 100-to-1 ratio as between powder and crack cocaine.  See 21 U.S.C. § 841(b).  In other words, it takes 100 times as much powder cocaine as crack cocaine to trigger the same mandatory penalties.  Using this ratio as a guide, in 1987, the Sentencing Commission set proportionate sentences for all powder and crack quantities, not just the statutory mandatory minimum sentences.  Tison, Amending the Sentencing Guidelines at 417 & n.34 (citing U.S.S.G. § 2D1.1 (1987)).

This approach to crack cocaine quickly drew criticism.  This was because crack cocaine and powder cocaine are two forms of the same drug and African-Americans tended to be prosecuted more frequently than whites for crack-crime.  Id. at 418 & nn. 39 & 40.  As a result, in 1994, Congress directed the Sentencing Commission to study the issue and report back.  Id. at 419 (describing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 280006, 108 Stat. 2097 (1994)).

In 1995, the Sentencing Commission responded to Congress.  It found that, while certain aspects of crack use and distribution warranted harsher treatment, the current 100-to-1 ratio was too great.  1995 Report at iii.

Despite the recommendation for change, the Commission recognized an important point which is particularly pertinent to our present discussion.  That was: "Significantly, all federal circuit courts addressing the constitutionality of crack cocaine penalties have upheld the current federal cocaine sentencing scheme, including the 100-to-1 ratio.  The courts have held that Congress had a 'rational basis' for the penalty distinction . . . ."  Id. at 118.  Despite this rational basis and the

recognition that some aspects of crack-crime warranted greater punishment, the Commission found that a better policy solution could be chosen.

As a result, on May 11, 1995, the Sentencing Commission presented to Congress several amendments to the Sentencing Guidelines. See Tison, Amending the Sentencing Guidelines at 424 (citing and discussing the proposed amendment found at 60 Fed. Reg. 25,074 (1995)). Amendment Five proposed elimination of the 100-to-1 ratio, but it also proposed increased punishment for all drug offenses involving firearms or other dangerous weapons and authorized upward departure for cases involving bodily injury. Id.

Congress was not persuaded. Id. at 425 & n.86 (citing and discussing Pub. L. No. 104-38, § 1, 109 Stat. 334 (1995)). Instead, Congress directed the Commission to issue further recommendations, but it made clear that sentences for trafficking in crack should generally exceed sentences imposed for the distribution of an equivalent amount of powder cocaine. Id. & nn.87-88 (citing Pub. L. No. 104-38, § 2(a)(1)(A), 109 Stat. 334 (1995)).

Since then, the Commission has submitted two reports suggesting further refinements of the crack penalty structure. See United States Sentencing Commission, Special Report to the Congress: Cocaine and Federal Sentencing Policy (April 1997) (hereinafter "1997 Report"), available at http://www.ussc.gov/reports.HTM, under "Drug Topics"; United States Sentencing Commission, Report to the Congress:  Cocaine and Federal Sentencing Policy, (May 2002) (hereinafter "2002 Report"), available at http://www.ussc.gov/r_congress/02crack/2002crackrpt.htm.

The 1997 Report basically proposed a 5-to-1 ratio. Id. at 9. The 2002 Report proposed a series of recommendations that would, if adopted,

> narrow the difference between average sentences for crack cocaine and powder cocaine offenses from 44 months to approximately one year . . . . Specifically, the Commission estimates that the average sentence for crack cocaine offenses would decrease from 118 months to 95 months, and the average sentence for powder cocaine offenses would increase from 74 months to 83 months. Importantly, the guideline sentencing range based solely on drug quantity for crack cocaine offenses still would be significantly longer (approximately two-to-four times longer) than powder cocaine offenses involving equivalent drug quantities, depending on the precise quantity involved.

Id. at ix.  This effectively amounted to a ratio of 20-to-1.  Id. at 107.

Congress, however, has not adopted the proposals set forth in either report. See Tison, Amending the Sentencing Guidelines at 426-29.  Congress also refused to adopt the Clinton administration's proposed 10-to-1 ratio.  Id. at 428.

## II.  Analysis

I first examine whether the crack Guidelines should normally be followed.  I then examine whether they should be applied to this defendant.

### A.  The Crack Guidelines Should Normally Be Followed

I cannot get Lee Flora Wallace out of my mind.  Ms. Wallace was a sad, black crack addict who, using her socks, hung herself in the holding cell adjacent to my courtroom shortly after a jury over which I was presiding found her guilty of crack cocaine trafficking.  See United States of America v. Lee Flora Wallace, 4:CR97-3045.  Although she did not die as a result, her brain injury was so severe that she suffered from dementia due to anoxia and never recovered.  With Lee Flora Wallace in mind, I turn to the crack Guidelines.

The awful, racist-tinged epithet "crack whore" has entered our lexicon of insults.  This is in part because popular culture, as crude as it is, recognizes a fundamental truth about crack.  That is, as the case of Lee Flora Wallace illustrates, crack cocaine frequently possesses and destroys the poorest and most vulnerable among us.  It is for that reason—Congress' evident desire to protect those who are least able to protect themselves—that a judge ought not play legislator and should instead give the crack Guidelines substantial or heavy weight after <u>Booker</u>.  It is that simple.  <u>Booker</u>, 125 S. Ct. at 768 (consistent with the Constitution, Congress may pick the "sentencing system" that it "judges best").

I recognize, however, that a lot of very good and very smart judges disagree.  Next, I briefly address the two main arguments of those judges who, using <u>Booker</u>, would substitute their penalty choices regarding crack cocaine for the choice made by Congress.  Respectfully, I find the arguments of these judges wanting.[9]  After that, I point out that if we judges try to meddle, we will make things even worse.

### 1.  The Reasons for Change Are Not Plainly Superior to Congress' Choice

First, it is argued that the Sentencing Commission and many other learned people believe the "100-to-1" ratio detracts from the logic and coherence of the sentencing system put in place by Congress and, therefore, there is a principled basis for deviating from the crack Guidelines.  For example, it is argued that crack is certainly no worse than powder cocaine, and thus any system that punishes crack-crime more harshly than other drug-crime will produce asymmetrical ("unfair,"

---

[9]To be clear, if I were the "King," I would adopt the Sentencing Commission's 2002 approach to crack cocaine.  My disagreement with judges who use <u>Booker</u> to implement the Sentencing Commission's views or some other approach is not primarily that their reasons are faulty in the abstract, but that they give insufficient deference to Congress' contrary, but reasonable, policy preferences.  I also fear that some judges will give reduced crack sentences with little or no explanation except to mumble that "the sentence I impose is plenty!"  That would leave the rest of us in a real pickle.

"unequal," or "unjust") results for offenders. Indeed, so the argument goes, that is one reason why the expert agency that Congress created, the Sentencing Commission, has repeatedly recommended to Congress that it change the crack penalty structure.

Ultimately, however, the determination that one crime is "worse" for society than another crime and therefore worthy of greater punishment is a predictive, value judgment, and, more importantly, a quintessentially legislative one. Everyone agrees that crack cocaine is very bad for society, and particularly for the poor people who consume it or reside within those communities that are ravaged by it. That being so, Congress may reasonably instruct judges that crack cocaine trafficking is not only very bad, but very, very bad, and thus justly punished more harshly than trafficking in other drugs like powder cocaine. In sum, when it comes to punishment, judges lack the legitimacy of legislators (or theologians) to create their own categories of evil.

Second, it is argued that the harsh crack Guidelines fall disproportionately on black defendants and therefore crack ought to be punished like powder cocaine to equalize things. There are a series of problems with this argument.

While properly worried about perceptions, the Sentencing Commission has found the assertion that black crack cocaine traffickers are subjected "to unwarranted disparity based on race . . . cannot be evaluated scientifically." 2002 Report at 103. In short, there is no evidence to support the proposition that black crack cocaine traffickers are punished more harshly because they are black.

Furthermore, assuming that blacks are prosecuted in percentages greater than their representation in the general population, that fact is not sufficiently meaningful for a judge, using Booker, to trump Congress' choice and effectively lower the penalties for crack. There are separate reasons why this is so.

Initially, if penalties for crack, including the Guidelines, fall more frequently on black defendants than white defendants, it was and is perfectly proper for Congress to conclude that the reason for such disproportion is that poor, especially vulnerable, black victims are disproportionately harmed by crack and the black crack dealers who sell their terrible wares in black communities. It is this fact—the victimization of African-American communities—that has caused some good thinkers to conclude that "we should 'commend rather than condemn' the distinction Congress has made between powder cocaine and crack." Tison, Amending the Sentencing Guidelines at 432 & n.135 (quoting Randall Kennedy, The State, Criminal Law, and Racial Discrimination: A Comment, 107 Harv. L. Rev. 1255, 1269 (1994)).[10] See also McMurray, 833 F. Supp. at 1466-67 (discussing the policy rationale that Congress could use to justify "disproportionate" sentences and prosecutions).

Moreover, even if black crack dealers are more harshly treated than white powder cocaine dealers and one wants desperately to cure that perceived inequality, there is no plainly superior reason why a judge, using his or her newfound Booker discretion, ought to *lessen* the presumptive prison sentence for crack as opposed to *increasing* the presumptive prison sentence for powder cocaine. As one thoughtful commentator put it,

> A resolution raising cocaine penalties and, subsequently, lessening the gap between sentences would alleviate the unfairness and racial bias in sentencing fueling this debate for so long. Although penalties for crack offenses would remain just as harsh, penalties for

---

[10]As then Deputy Attorney General Larry D. Thompson, a black man, told the Sentencing Commission, crack cocaine is devastating "especially [to] minority communities[,]" and "[l]owering crack penalties would simply send the wrong message. The message that we care more about crack dealers than we do about the people and the communities victimized by crack." Testimony of Larry D. Thompson Before the U.S. Sentencing Commission (March 19, 2002), *available at* 2002 WL 31308064, *3.

cocaine use would be raised to a higher level. This change would effect Caucasians, since they are the major users of cocaine. Harsher cocaine penalties will weaken inferences concerning the relationship between severe crack penalties and African -American users by bridging the gap between crack cocaine and powder cocaine sentences.

Tison, Amending the Sentencing Guidelines at 434.

In short, judges ought not give black crack dealers a "break" in order to treat them as "leniently" as white powder cocaine dealers because (1) we personally worship the notion of equality above other values, and (2) we think Congress is far too harsh on crime as a general matter. We might just as well hammer both types of drug trafficking equally—that, at least, would satiate our sometimes excessive egalitarian appetites and yet be far more consistent with the will of Congress.

In summary, Congress has made a choice regarding crack cocaine. To my way of thinking, it is not the best choice, but it is not a crazy one either. As a judge, I should defer to the choice of penalties that Congress has made for crack cocaine even though I would quickly do something different if it were within my proper role to choose. This is because judge-made changes to the crack Guidelines, while sometimes principled, are (1) undemocratic, and (2) not plainly superior to the judgments of Congress. We should maintain the status quo when exercising our Booker discretion within the context of the crack cocaine Guidelines because we are judges and not legislators and because the status quo is what Congress has chosen.[11] When it comes to the severity of punishment, Congress has the right to be wrong.

---

[11]Given the recent attacks on the federal judiciary by a few members of Congress, I sometimes wonder why I ought to care about differentiating between the proper role of judges and legislators. When I get in that pessimistic frame of mind, the long view of history persuades me that "this too shall pass" and that the work is worth the toil. In the face of such childish complaining, there is also a certain self-satisfaction in behaving as an adult.

### 2. *We Are Likely to Muck Things Up Even More if We Do Our Own Thing*

Let us suppose, however, that I have not convinced the reader that we should maintain the status quo. What is the alternative?

I have my favorite, and that would be the 20-to-1 proposal set forth in the <u>2002 Report</u>. But, we might also adopt the Clinton administration's 10-to-1 ratio [12] or the 5-to-1 ratio set out in the <u>1997 Report</u>. Or, I have an idea, let us really make things fair and impose the mandatory minimum sentence whenever the pertinent crack Guidelines call for a sentence exceeding that minimum. Wait a minute—perhaps we should merely mimic the powder cocaine Guidelines.[13] Better yet, let us put together a hybrid of all these approaches. Now, here's the ticket, forget about drug quantities altogether and impose no sentence that is greater than necessary.[14] The permutations are as numerous as there are federal judges who sentence crack dealers.

Come to think of it, why should we limit ourselves to fiddling with the crack Guidelines? While we are at it, perhaps we should increase, or maybe we should

---

[12]The defendant favors this ratio. (Filing 138, at 6.)

[13]The Federal Public Defender favors this approach. (Br. of Amicus Curiae at 11.)

[14]If a criminal defense lawyer invokes the "not greater than necessary" chant one more time as the raison d'etre for a sentence below the Guidelines, I am likely to throw up. What the hell does "not greater than necessary" *really* mean? Please do not refer me to 18 U.S.C. § 3553(a)(2) as if it provided a concrete answer for individual cases. Centering a sentence on the words "not greater than necessary" is the judicial equivalent of reading tarot cards–neither the legitimacy of the sentence nor the truth of the reading can be proved or disproved by rational means. More to the point, why should anyone trust one unelected judge like me to provide ad hoc definitions of this virtually meaningless and circular abstraction unencumbered by the lodestar of the Guidelines? <u>Booker</u> tells me to use discretion. It does not tell me to pick sentences out of the air by fixating on the phrase "not greater than necessary" as an excuse to sentence below the Guidelines.

decrease, the punishments we impose for methamphetamine trafficking. Incidentally, if we are going to rewrite the law for meth-sentencing, I might vote for an increase.[15] You cannot understand the horror of this particular drug trade until you see what methamphetamine trafficking does to the people who use the drug, the communities that must deal with the resulting social costs, and the poor and vulnerable Mexican mules who frequently truck it up from the super labs across the border in exchange for a ride to an American meat-packing plant where they hope to find legitimate (but incredibly hard) work.

Simply stated, unlike Congress or the Commission, we judges lack the institutional capacity (and, frankly, the personal competence) to set and then enforce one new, well-chosen, theoretically coherent, national standard. As opposed to a uniform, albeit flawed, Guideline, it would make things far worse to have a bunch of different standards for crack sentencing. For that reason alone, we should sit on our collective hands and give the crack Guidelines substantial or heavy weight until Congress decides otherwise.

### B.  In This Case, A Guideline Sentence is Reasonable

After careful review, I am satisfied that a sentence within the advisory Guideline range is reasonable and consistent with all the goals of sentencing. There is no basis for a departure under pre-Booker theory and there is no reason to vary or deviate from the Guidelines because of some other factor.

Tabor has filed a departure motion (filing 94, attachment 1), but it is of the make-weight variety and I will deny it. All the factors he relies upon are of the discouraged variety under the advisory Guidelines. See U.S.S.G. §§ 5H1.6 (family ties); 5H1.11 (military service and good works).

---

[15]Let's roll some logs.  I will adopt your crack proposal, if you adopt my meth proposal.  Deal?

Essentially, he claims that because of his military record (honorable discharge from the Army in 1987), family ties and responsibilities (his mother is sick and he returned to Arkansas to care for her after he was charged), and his charitable works (also of a post-indictment vintage), I should be more lenient and depart downward. Although I have the power to depart, none of these factors singly or collectively warrant a departure under pre-<u>Booker</u> departure theory or a variance under post-<u>Booker</u> jurisprudence.

While I laud Tabor's military service, I hope I will be forgiven for doubting that his recent concern for his mother or his recent attention to churchly matters mean very much relevant to sentencing.[16] In fact, if I were to concentrate upon personal characteristics, I would conclude that Tabor is less deserving of sympathy than a lot of crack dealers. At the time he committed his crime, he was not addicted to the drug but was selling it for personal gain and he was more mature, came from a more solid family background,[17] and was better educated than many others who engage in this type of crime. In sum, crack dealers like Tabor who have served in the military, who have looked after their sick mothers, and who have become church-going, remain crack dealers who have preyed upon the most vulnerable in our society. As such, they merit no leniency.

A prison sentence of 200 months (about 16.7 years), which is one year more than the low end of the range and nearly three years below the high end of the range, will fulfill the statutory goals of sentencing. It is no longer than necessary (whatever that may mean). Comparing the five sentences that I originally imposed on the

---

[16]Putting the best face on the recency of Tabor's concern for his mother and good works, counsel argues: "It is noteworthy that many of these activities took place after the time frame alleged in the Indictment for criminal activity. This means David Tabor rehabilitated himself, without incarceration." (Filing 94, Attachment 2 (Brief at third unnumbered page).)

[17]Tabor's sisters have lived law-abiding and productive lives. One is a deputy sheriff and the other a probation officer. (PSR ¶ 59.)

related defendants who cooperated with the government (235 months, 210 months, 210 months, 188 months, and 87 months), with a sentence of 200 months for Tabor, one finds that Tabor's sentence is at the mid-point.  Such a sentence accurately represents Tabor's relative culpability as compared to these men.  Five years of supervised release will likewise serve all the goals of sentencing.  It, too, is no longer than necessary.

In declaring my intention to impose this long sentence, I emphasize something that is frequently overlooked in situations like this.  That is, the defendant was obviously guilty and he could have saved himself a lot of time in prison had he merely accepted responsibility for his actions and told the truth.  This is important because it illustrates that the crack penalty structure is not as draconian as some assert.

Since he was safety-valve eligible, he could have substantially reduced his time in prison by telling the government what he knew about the crime of conviction and he could have avoided the statutory minimum sentence.  See U.S.S.G. §§ 2D1.1(b)(7) & 5C1.2.  Had he truthfully admitted his wrongful conduct, and told the government what he knew, his total offense level would have dropped to 31 and he likely would have received a prison sentence of 108 months (the low end of the range for total offense level 31 and criminal history category I). Guidelines Manual, Chap. 5, Part A (Sentencing Table).

However, as was his right, Tabor bet against the government.  He lost.  Now, he must pay the "vig.," excessive although it may be.[18] Unlike Lee Flora Wallace, Tabor has no right to complain.

---

[18]Throughout, Tabor has been represented by retained or appointed counsel and sometimes both.  All of them have worked hard for him.

IT IS ORDERED that a sentence within the advisory Guideline range should be pronounced for Mr. Tabor.  That is, the Court will impose a sentence of 200 months in prison, and 5 years of supervised release.  Tabor's objections to the presentence report (filing 95) and his departure motion (filing 94, attachment 1) are denied.  The Court further determines that it will be its practice to accord the crack cocaine Guidelines heavy or substantial weight in the future.

DATED this 18th day of April, 2005.

BY THE COURT:
*s/Richard G. Kopf*
United States District Judge